IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| GUY LEN ALLEN, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | |
| | § | ACTION NO. 1:10-CV-651-LY-AA |
| RICK THALER, | § | (Death Penalty Case) |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| Respondent. | § | |

**RESPONDENT THALER'S ANSWER WITH BRIEF IN SUPPORT**

Petitioner Guy Len Allen was convicted of capital murder and sentenced to death for killing his on-and-off-again girlfriend, Barbara Hill, and her daughter, Janette Johnson, during the same criminal transaction. Allen seeks relief in this Court, which possesses both personal and subject matter jurisdiction, pursuant to 28 U.S.C. § 2254. Respondent Rick Thaler (the Director) denies all of Allen's assertions of fact except those supported by the record or specifically admitted herein. Although Allen seeks habeas relief he has failed to show that any of his claims have merit or that he is entitled to further factual development. Accordingly, the Director respectfully requests that Allen's petition for a writ of habeas corpus be denied with prejudice.

1

## PETITIONER'S ALLEGATIONS

The Director understands Allen to allege the following grounds for relief:

1.    Trial counsel were ineffective during the punishment stage of trial because:

    a.    They were unprepared for the State's introduction of evidence regarding the killing of Henry Maciel, and did not adequately challenge such evidence or rebut it;

    b.    They did not adequately challenge the State's future dangerousness expert, Dr. Richard Coons, during a pretrial hearing on admissibility;

    c.    They failed to competently prepare their psychiatric expert, Dr. Robert Cantu; and

    d.    They failed to sufficiently prepare and present a mitigation defense; and

2.    State habeas counsel was ineffective for failing to develop and present the above-listed claims of ineffective assistance of counsel.

Amend. Pet. 10–63, ECF No. 25.  As fully briefed in the Director's answer, Allen has failed to show that the Court of Criminal Appeals unreasonably adjudicated these claims—at least those which have been exhausted in the state forum—or that he is otherwise entitled to habeas corpus relief under the Antiterrorism and Effective Death Penalty Act (AEDPA).  The Court should deny Allen's requested relief and deny the petition with prejudice.

## STATEMENT OF THE CASE

A jury convicted Allen of capital murder for killing his on-and-off-again girlfriend, Barbara Hill, and her daughter, Janette Johnson, during the same criminal transaction.  CR 251.[1]  After a separate punishment hearing the jury answered the submitted special issues in such a way that Allen was sentenced to death.  CR 259, 261–65.  The Court of Criminal Appeals, on direct appeal, affirmed the judgment of conviction, *Allen v. State*, No. AP-74951, 2006 WL 1751227 (Tex. Crim. App. June 28, 2006), and the Supreme Court of the United States denied Allen's petition for a writ of certiorari from direct appeal, *Allen v. Texas*, 549 U.S. 1123 (2007).

With his direct appeal still pending Allen filed an application for state habeas relief.  SHCR 51–243.  After a live evidentiary hearing the habeas trial court entered written findings, and recommended that relief be denied.  Supp. SHCR 243–53.  The Court of Criminal Appeals adopted the trial court's

---

[1] "CR" refers to the documents and pleadings filed in the state convicting court, or clerk's record.  "Supp. CR" refers to the additional documents and pleadings filed in the state convicting court, or supplemental clerk's record.  "RR" refers to the transcribed statement of facts at trial, or reporter's record.  "SX" and "DX" refer to the exhibits proffered by the State and Allen, respectively, at trial, and found in volumes twenty-two through twenty-seven of the reporter's record. "SHCR" refers to the documents and pleadings filed in the state habeas court, or state habeas clerk's record.  "Supp. SHCR" refers to the additional documents and pleadings filed in the state habeas court, or supplemental state habeas clerk's record.  "Supp. SHTr." refers to the transcribed statement of facts at habeas, or supplemental state habeas transcript.  The references are preceded by volume number and followed by page or exhibit numbers where necessary.

recommendations, and denied relief.  *Ex parte Allen*, No. WR-73329-01, 2010

WL 3430708, at *1 (Tex. Crim. App. Aug. 25, 2010).[2]

Allen now seeks federal relief by filing an amended petition for a writ of

habeas corpus.   Amend. Pet. 10–63.   The Director submits the following

answer in response.

## STATEMENT OF FACTS

### I.   Guilt-Innocence Facts.

Allen was in an on-again, off-again dating relationship with Barbara

Hill.  13 RR 20–21.  Hill lived in Austin with her daughter, Janette Johnson,

and Allen sometimes stayed with them.  13 RR 20.  About a month before her

death Hill had attempted to break up with Allen and remove him from her

residence.  13 RR 23–26.  About a week before Hill's death Allen visited his

ex-wife, Darlene Allen, stating that he needed a new living arrangement. 14

RR 34–39.

At 5:05 a.m. on April 3, 2002, Johnson placed a 911 phone call.  13 RR

36–38; SX 5–6.  Johnson stated that there was "domestic violence" occurring

at her mother's home between her mom and her "mom's friend."   SX 6.

Johnson stated that Hill's "friend" was hitting Hill behind a locked door and

---

[2]  The cover of the initial state habeas clerk's record indicates that Allen's state habeas application was denied on July 14, 2010.  SHCR cover.  The electronic docket for the Court of Criminal Appeals does not reflect any such action on that date, and the written opinion of the court indicates that the denial actually occurred on August 25, 2010.  *Ex parte Allen*, 2010 WL 3430708, at *1.  The Director does not rely on the July 14, 2010 date for any purpose and believes such date to be in error.

would not stop.  SX 6.  The call ended soon after it began, and it terminated on Johnson's end of the line.  13 RR 40.

Police arrived seven minutes after Johnson made the 911 phone call and found a grizzly, bloody scene with Hill dead in the backyard, and Johnson dead in the kitchen. 13 RR 41–45, 51–56.  They both bore obvious stab wounds.  13 RR 44.  The scene was secured and various police personnel arrived to document and collect evidence.  *E.g.*, 13 RR 74.  A massive search began for the perpetrator.  14 RR 52–53.

Allen's maroon and white car was parked outside of Hill's home, and blood was observed on a door handle.  13 RR 47, 60.  In the car was a blue duffle bag, also with blood on it, and a blood covered black shoe whose mate was found in the side yard of Hill's house.  13 RR 61–63.  A dry cleaning receipt in Allen's name, and a piece of mail addressed to Allen with Hill's address on it were also discovered inside the house.  13 RR 127, 170.  A bloody knife was eventually located under the refrigerator in the kitchen, and an email printout, which appeared to have a bloody fingerprint on it, was collected.  13 RR 208, 15 RR 174.

The bloody fingerprint was later analyzed and found to match Allen, and the blood on the email printout was Hill's.  16 RR 24–25, 112.  Further, Allen's DNA was found in a vaginal swab taken from Hill, and blood found on a doorknob inside the house.  16 RR 109, 110.  Additionally, a mixture of

5

Allen and Hill's DNA was found on Allen's car door handle, and the handle of the knife.  16 RR 120, 135.  A mixture of DNA from Allen, Hill and Johnson was found on the knife's blade.  16 RR 134.

Around 7:00 p.m. Allen went to the home of Jerome Richard looking for a man named "Pokey."  13 RR 219–20.  "Pokey" was not there and Allen then asked to borrow a pair of pants.  13 RR 220–21.  When Richard provided Allen with a pair of pants he noticed that Allen had a cut on his hand, and that his shirt and pants had blood on them. 13 RR 223–24.  Richard's wife, Tonya Harmon, called the police.  13 RR 237.

Shortly thereafter Allen was taken into custody by police near the Richard home at a convenience store around 8:00 p.m.  14 RR 3–8.  On his person Allen had a bloody wallet. 14 RR 9–10.  Another police officer retraced the steps from the Richard home to the convenience store and discovered a pair of bloody pants in a garbage can.  14 RR 27–28.

Allen was interviewed by police that night.  SX 307–08.  After waiving his *Miranda* rights Allen admitted that he had lived at Hill's home occasionally, and that his car was parked in front of Hill's home.  SX 308, at 6–8.  Allen stated that his relationship with Hill was not going well, and that they argued the morning of her death.  SX 308, at 10–14.  Allen never discussed what happened after his argument with Hill.  *E.g.*, SX 308, at 15.  Allen's blood-stained clothing, and various parts of Allen's body were

swabbed for DNA testing.  15 RR 195–202.  A blood sample was also taken from Allen.  15 RR 7.

A mixture of Allen's and Hill's DNA was found on the pants located in a trash can, Allen's wallet, two socks that Allen had used to wrap his wounded hand, Allen's shirt, and the blood found on Allen's body. 16 RR 115, 118, 126, 129, 131.  Further, Johnson's DNA was discovered on one of the socks that had covered Allen's wounded hand.  16 RR 128.

Much of the physical evidence and photographs from the crime scene were provided to Tom Bevel, a renown expert in bloodstain pattern analysis. 15 RR 35–40.  From the bloodstain evidence he determined the course of Allen's attack on Hill and Johnson.  15 RR 47.

Bevel opined that Hill was attacked before Johnson, and her stabbing began in the master bedroom, on or near her bed, and at some point she ended up on her hands and knees on the master bedroom floor while still being stabbed from above.  15 RR 53, 60.  Hill then went into the master bathroom all the while being stabbed by Allen.  15 RR 61.

Johnson then interrupted the attack on her mother in the master bathroom and Allen began to stab Johnson.  15 RR 118–19.  Johnson then moved into the kitchen while Allen continued to stab her, where she finally succumbed to her wounds.  15 RR 120, 136.

After the attack Hill moved from the master bathroom, through the kitchen—where she would have gone past her daughter's body—into the living room, and outside the front door. 15 RR 136–37.  From there, Hill moved alongside her house into the backyard and died. 15 RR 137–38.

After killing Johnson, Allen returned to the master bedroom. 15 RR 136. He then went through the living room, down the front steps, to his parked car, and then away from the house.  15 RR 140–41.

An autopsy of Hill found that she had been stabbed or cut forty-six times, including thirteen wounds to the head and face, and with injuries to the pericardium (covering of the heart), the pulmonary vein, and the lungs. 16 RR 34–36, 64–65; SX 420.  Several wounds on Hill were classified as defensive, and wounds to Hill's back were consistent with an attempt to flee her attacker.  16 RR 49, 68.  Johnson's autopsy indicated that she had been stabbed or cut ten times, with one wound to her jugular vein, and another to her lung. 16 RR 73–74, 80–81; SX 421.

## II.  State's Punishment Evidence.

Allen had an extensive history of violence, especially towards women. Allen had dated Cindy Fisher on and off from 1995 to 1997, and had a son with her.  17 RR 119–20.  In January 1994, a police officer stopped Fisher to discuss Fisher's physical condition.  17 RR 132–33.  Fisher had a bruised face and told the police officer that Allen had "beat me up."  17 RR 133–35.

8

In February 1994, Henry Maciel died after fighting with Allen.  18 RR 7–8.  Before the fight Allen had complained that Maciel owed him $10.00, and stated that he was "going to do something" about it.  18 RR 24.  Candy Guerra, who lived near Allen and Maciel, heard Allen swearing at Maciel and saw Allen acting aggressively towards Maciel.  18 RR 39–40.  Later, Guerra heard more arguing and "some scuffling," and when she got to her window she saw Allen walking away from Maciel. 18 RR 40–41.  A few seconds later Maciel started gasping for air, he collapsed, and turned purple.  18 RR 41–42. Maciel died from bleeding on the brain caused by a ruptured vertebral artery. 18 RR 120–23.  Maciel's injuries were consistent with a blow to the back of the neck causing him to strike his face on the ground and then bleed to death from the ruptured vertebral artery.  18 RR 124.

Allen left the immediate area and eventually approached a plain clothes police officer who had responded to the incident, and admitted that he had fought with Maciel but did not mean to kill him. 18 RR 50–54.  Allen also admitted that the fight was over a $10.00 debt and a chain.  18 RR 55–56.

In December 1998, Allen "just got into it" with his then-wife, Darlene Allen.  17 RR 27.  Allen hit Darlene from behind, she then heard her daughter, Megan Curtis, scream out for her, and she saw Allen take "off after" Megan.  17 RR 63.  Allen then came back to Darlene's location and said "I'm going to kill you now."  17 RR 64.  Darlene did not remember much about

9

the attack after that.  17 RR 64–65.  Darlene suffered a broken jaw, and a lacerated spleen, and both injuries required surgery.  17 RR 67–68.  The emergency room doctor who treated Darlene described her injuries as "one of the most severe beatings that I've seen, and I see them all the time."  19 RR 9.  Darlene's fractured jaw was protruding from her skin, and the injury to her spleen was described as "fairly common . . . [in] high-speed car wrecks or falls."  19 RR 13–15.  Had she not had her spleen removed Darlene would have died.  19 RR 16.  In addition, Darlene had a fractured rib, and had required six units of blood—an amount the doctor had never seen in a person-on-person assault.  19 RR 17–18.  Darlene remained afraid of Allen up until the time of trial.  17 RR 85.

On the evening of Darlene's assault Megan discovered Allen standing over her mother while hitting her, and she yelled at him to stop.  17 RR 94–95.  Allen approached her, and Megan opened a window to call for help.  17 RR 95–96.  The next thing Megan remembered was hitting a metal clothesline post outside her window, and Megan told police officers that Allen had pushed her out of the window.  17 RR 96–98.  Megan was transported to a hospital and eventually had "a rod and two screws placed" in her right thigh bone.  17 RR 102–03.  The injury caused numbness and pain in her leg up until trial, and she had to quit playing volleyball as a result.  17 RR 104.

After being arrested for the present offense Allen shared a jail cell with fellow inmate Freddie Osmer.  17 RR 135–36.  Allen stated, in complaining about the jail's food, that he should have eaten the last meal that Hill had prepared because the jail's food was "bad."  17 RR 137–38.  And while in jail awaiting trial Allen beat a man with "mental problems," and fought another inmate.  18 RR 86–88, 101–03.  Jail personnel described Allen as an individual who other inmates avoided and respected in jail, and who had the highest security classification level.  18 RR 93–94, 106–07.

In addition to the present offense Allen had been convicted of cocaine possession, twice for delivery of cocaine, criminal trespass, assault (Darlene), and aggravated assault (Maciel).  17 RR 147–55; SX 478–84.  His sentences ranged in time from five days to nine years.  17 RR 147–55; SX 478–84.

Tyler Davis was Johnson's father, and she was his oldest child.  19 RR 30–31.  While Davis lived in Dallas and Johnson in Austin they would visit regularly, and had a close relationship.  19 RR 33–34.  Davis was particularly proud that Johnson had graduated from high school, and "five carloads" of family members made the trip to Austin to watch her graduate.  19 RR 37–38.  Davis remembered the day he was told about Johnson's death and the news "floor[ed]" him.  19 RR 43.  He immediately left for Austin, and held a funeral for Johnson and Hill. 19 RR 44–45.  Even though Johnson had died

two years prior to trial Davis thought about her every day, and still could not drive more than ten minutes at a time or he would start crying.  19 RR 46.

At the time of her death Johnson was dating Jequainte Flowers, her former high school classmate. 19 RR 56–59.  He described Johnson as a "good student" who was close with her mother.  19 RR 58, 61.  After graduating Flowers went into the military and Johnson started college but they still kept in contact.  19 RR 61–63.  They eventually started talking about "getting engaged and getting married in the future."  19 RR 63–64.  When Flowers learned of Johnson's death he was stationed in South Korea and was in the middle of physical training.  19 RR 66–67.  His mother phoned him, and he couldn't believe the news.  19 RR 68.  He then traveled from South Korea to Austin for Johnson's funeral, and felt guilty because he was so far away at the time of her death.  19 RR 70.

Hill's sister, Charlotte Jackson, described Hill as an adventurous and kind person who shared what she had with her six brothers and sisters growing up.  19 RR 71–72.  Hill was also close to her daughter, Johnson, and was a jokester.  19 RR 75.  Jackson testified that Johnson had a strong desire to graduate from college, and that she had a loving personality.  19 RR 82.  Jackson had also met Allen, and described an incident where Allen turned into a "caged animal" due to the inconvenience caused by a disruption in phone service.  19 RR 79.  Jackson also testified that Hill had purchased a

12

new lock for the house shortly before her death.  19 RR 84–86.  Jackson additionally stated that the loss of Hill still affected her family at the time of trial, especially at family gatherings that Hill and Johnson used to regularly attend.  19 RR 89–90.

Royce Smithey, the chief investigator for Special Prosecution Unit, testified about crime in prison. 19 RR 119–21.  Specifically, Smithey stated "there's a lot of violence" in TDCJ, including assaults with homemade weapons, and murders.  19 RR 122, 134–35.  He noted that a capital murderer who receives a life sentence would not wear a different uniform from other inmates, and TDCJ guards would have no particular reason to know of the inmate's prior acts of violence.  19 RR 127–28.  Smithey also stated that there is no absolute way to prevent an inmate from committing an act of violence, and that even inmates on death row have injured others. 19 RR 136–38.  Further, inmates in general population would have contact with volunteers at the prison, civilian medical personnel, and librarians.  19 RR 163.

Finally, Dr. Richard Coons, a licensed psychiatrist, reviewed numerous records related to Allen, and stated that he could predict future dangerousness given sufficient information.  19 RR 176–84.  After being given a hypothetical incorporating the guilt-innocence and punishment evidence Dr. Coons stated that there is a probability that Allen would commit

13

criminal acts of violence in the future. 19 RR 184–87.  Dr. Coons also stated that Allen did not express remorse for his actions, and that a person who gets into a rage cannot control their actions. 19 RR 192–93.

### III.  Allen's Punishment Evidence.

The second chair attorney who represented Allen at his trial for Maciel's death confirmed that he was acquitted of murder, and convicted of a lesser included third degree felony, aggravated assault.  20 RR 19–21.  He also stated that the jury heard from the purported eyewitnesses and a medical examiner yet found Allen not guilty of murder.  20 RR 22.  Further, he confirmed that the State offered a deal on punishment—nine years probation—after the jury deliberated for "a long time."  20 RR 22.

Freddie Osmer was recalled and it was revealed that he had been a member of the Aryan Nation Brotherhood, a white supremacist prison gang, but was no longer a member because he had "ratted out [his] brothers and testified against them."  20 RR 39–40.  Osmer denied that his testimony was motivated by racist intentions, or a desire to see Allen, an African American, receive a death sentence.  20 RR 40–43.

Also, the prior trial testimony of Dr. Suzanna Dana—the original medical examiner who autopsied Maciel—was read to the jury.  20 RR 246; DX 3.  Dr. Dana testified that all blows to Maciel were to the eye, the jaw,

and underneath the ear.  DX 3, at 35.  Unlike at Allen's capital murder trial there was no mention of Maciel being struck from behind.

Larry Fitzgerald, the former public information officer for TDCJ, testified regarding Texas's prison system.  20 RR 50.  He testified that TDCJ's goal was to have zero probability of violence although he acknowledged that "anything's possible."  20 RR 55.  To achieve that goal TDCJ employs an individual assessment system to determine an inmate's placement within TDCJ, as it relates medically and vocationally.  20 RR 56–57.  The inmate is also assessed to determine his appropriate level of custody, and that these evaluations are constantly occurring.   20 RR 57–60.  Fitzgerald also testified that TDCJ guards go through extensive training, and that most "civilians" are former TDCJ guards.  20 RR 64–65.  Fitzgerald also narrated a video showing the workings of a TDCJ prison.  20 RR 66–77.

Fitzgerald continued and stated that a TDCJ prison was safer than a typical city of comparable size to TDCJ's inmate population, and that he would feel safer in a TDCJ prison than at an ATM machine at night in Austin.  20 RR 79.  He also testified that homicides are rarer in a TDCJ prison than in Austin or Waco, and that TDCJ did not document any violent behavior from Allen during his incarceration for aggravated assault.  20 RR 81–84.  Finally, Fitzgerald noted that the chance for escape from a TDCJ

prison was "pretty minimal," and that there was one TDCJ guard for every five inmates.  20 RR 87.

Steve Allen testified that he was Allen's older brother, and that they were "very close" as children.  20 RR 134–36.  Allen grew up as one of eight siblings living with his mother in East Austin in a single-room house measuring twenty-four by twenty feet.  20 RR 136.  The home had no glass in the windows, the plumbing was bad, and "the electricity was out most of the time."  20 RR 137.  Allen's mother slept in a cot, and the eight children slept on pallets on the floor.  20 RR 139.  The house had no refrigerator and they used hot plates to warm food when it was available.  20 RR 139.

The children enjoyed going to school because it guaranteed them at least two meals, and the summertime proved difficult because school food was unavailable.  20 RR 140.  In fact, there were entire days that the Allen family did not eat.  20 RR 140.  To obtain food the children would sometimes fish or pick pecans to sell.  20 RR 141–42.  When they occasionally had money the Allen children "would often get robbed by the bigger kids" or have their "food taken away."  20 RR 142.  A lot of times the children would have to fight going to and from the store, and Allen would attempt to protect them.  20 RR 142–43.

Allen's father was rarely at home and "when he was home, he was angry, upset, drunk and violent and mean."  20 RR 143.  His father also

routinely beat his mother, and when Allen would intervene he would be beaten as well. 20 RR 144–45. And although Allen's father was regularly employed that "didn't mean that [the Allen children] were going to eat." 20 RR 145.

In addition, Allen's mother would frequently "administer punishment" to her children. 20 RR 145–46. One particular incident saw Allen stripped naked, tied to a bed, and whipped with an extension cord. 20 RR 146. During this incident Allen's mother had to rest to catch her breath before continuing the beating. 20 RR 146. Despite such terrible conditions Allen, nevertheless, looked out for his siblings. 20 RR 147.

Eventually, Allen's mother found regular employment which required the children to spend time at their aunt's house while Allen's mother worked. 20 RR 147. The aunt's children, however, were much older than the Allen children and beat them when they would not listen. 20 RR 148. One cousin was particularly vile, and raped Allen repeatedly from the age of nine until eleven. 20 RR 148–49. The Allen children never spoke of the rape because they knew that they would have to go back to the aunt's house in the future. 20 RR 149.

Allen then started to work around the age of fourteen or fifteen at the Iron Works Barbeque, and brought home food for the family. 20 RR 150. Allen, however, also stole food and sold drugs to assist in feeding his family.

17

20 RR 150. Allen enlisted in the Army at seventeen, and his brother was proud of him for doing so and eventually enlisted as well. 20 RR 151. Overall, Allen was loved, and he was good to his family. 20 RR 151.

Dr. Robert Cantu testified that he was a forensic psychiatrist and that given enough information he could render a diagnosis and provide treatment options without having interviewed the patient—a practice he described as common in psychiatry. 20 RR 186–91. He also stated that the American Psychiatric Society opposes the use of psychiatry in assessing future dangerousness. 20 RR 192. Then, Dr. Cantu was given a hypothetical scenario incorporating much of Allen's history, and asked to give his diagnostic impressions. 20 RR 193–97.

Dr. Cantu testified that Allen's upbringing explained, though not excused, much of his present behavior. 20 RR 197–98. He stated that because Allen's father treated women as objects, and because Allen's father used physical violence against women, Allen did so as well. 20 RR 198–99. Allen was also affected by the fact that his own mother was not protective of him, and so he was angry with women as a result. 20 RR 199–200. Further, Allen's sexual assault made him overly aggressive in an attempt to stave off future assaults. 20 RR 200. And, despite Allen's horrible upbringing and psychological problems, he was still treatable in a meaningful way through therapy and medications. 20 RR 200–01

18

## ANSWER

Allen's petition is subject to AEDPA. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). Under 28 U.S.C. § 2254(d), as amended by AEDPA, a federal court may not grant habeas relief unless the state court adjudication (1) "was contrary to federal law then clearly established in the holdings of" the Supreme Court; or (2) "involved an unreasonable application of" clearly established Supreme Court precedent; or (3) "was based on an unreasonable determination of the facts in light of the record before the state court." *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (internal quotation marks omitted) (quoting 28 U.S.C. § 2254(d)(1)–(2); *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (*Terry Williams*)). And review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398–99 (2011).

A state court decision is contrary to clearly established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or confronts facts that are "materially indistinguishable" from relevant Supreme Court precedent, yet reaches an opposite result. *Terry Williams*, 529 U.S. at 405–06. A state court unreasonably applies Supreme Court precedent if it correctly identifies the governing precedent but unreasonably applies it to the facts of a particular case. *Id*. at 407–09. To determine whether a state court has made an

19

unreasonable application, a federal court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Richter*, 131 S. Ct. at 786.

Thus, "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the state court's decision. *Richter*, 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Woodford v. Visciotti*, 537 U.S. 19, 27 (2002) (federal habeas relief is only merited where the state-court decision is both incorrect and objectively unreasonable, "whether or not [this Court] would reach the same conclusion"). Further, "evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Alvarado*, 541 U.S. at 664. And "[i]t bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 131 S. Ct. at 786.

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded

> jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther.   Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal.

*Id*. (internal citations omitted).

Moreover, it is the state court's "ultimate decision" that is to be tested for unreasonableness, and not every jot of its reasoning.  *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc); *see Catalan v. Cockrell*, 315 F.3d 491, 493   (5th Cir. 2002) ("[W]e review only the state court's decision, not its reasoning or written opinion[.]").  Indeed, state courts are presumed to "know and follow the law."  *Visciotti*, 537 U.S. at 24.  And, even where the state court fails to cite applicable Supreme Court precedent or is unaware of such precedent, AEDPA's deferential standard of review nevertheless applies "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]."  *Early v. Packer*, 537 U.S. 3, 8 (2002).

Additionally, if the Supreme Court has not "broken sufficient legal ground to establish [a] . . . constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar" under either the contrary to or unreasonable application standard.  *Williams*, 529 U.S. at 381.  Stated differently:

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 131 S. Ct. at 786–87.   And a federal court must be wary of circumstances in which it must "extend a [legal] rationale" of the Supreme Court "before it can apply to the facts at hand" because such a process suggests that the proposed rule is not clearly established.  *Alvarado*, 541 U.S. at 666.

AEDPA also provides that the state court's factual findings "shall be presumed to be correct" unless the petitioner carries "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  Further, "[t]he presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).

Finally, an evidentiary hearing is precluded on claims adjudicated on the merits by the state court.  *Pape v. Thaler*, 645 F.3d 281, 288 (5th Cir. 2011) (a "district court err[s] by conducting [an] evidentiary hearing and by relying on evidence from that hearing to conclude that the state habeas court had unreasonably applied" clearly established federal law).  In certain other

22

situations, an evidentiary hearing is unwarranted because the petitioner has not diligently developed the state court record. *Williams v. Taylor*, 529 U.S. 420, 436 (2000) (*Michael Williams*). And if diligence is not in issue, then a petitioner may not obtain a hearing unless (1) a petitioner's claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise of due diligence; and (2) the petitioner establishes by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty. 28 U.S.C. § 2254(e)(2). Assuming no procedural barriers exist, it still remains appropriate to deny an evidentiary hearing if sufficient facts exist to make an informed decision on the merits. *Schriro v. Landrigan*, 550 U.S. 465, 474–75 (2007).

## I.  Allen's Claim That Trial Counsel Were Unprepared for the Introduction of Evidence Regarding the Maciel Killing Is Unexhausted and Procedurally Defaulted, and Is Without Merit in Any Event.

Allen claims that counsel were ineffective because they were caught flat-footed when the State introduced evidence at the punishment stage that Allen had murdered Henry Maciel. Amend. Pet. 13. Allen complains that trial counsel did not raise a Confrontation Clause objection to the testimony of Dr. Bayardo or Maciel's autopsy report, or object to the report as hearsay. *Id*. at 14–15. Further, Allen argues that counsel were unprepared to rebut the prosecutor's claim that the Maciel killing was a murder. *Id*. at 15–18.

23

Allen "supports" his claim by wrenching the actual events of trial out of context in an attempt to paint his counsel as ineffective; a fair reading of the record disputes this distortion, however.  He also uses the benefit of hindsight in challenging counsel's lack of objections because the opinions he relies upon are of recent, post-trial vintage.  Regardless, Allen has not presented this claim to the state courts and so it is unexhausted, and because a return to state court would not be fruitful, the claim is procedurally defaulted.  This Court should deny the claim with prejudice.

### A.    Allen's claim concerning counsel's preparedness regarding the Maciel killing is unexhausted and procedurally defaulted.

A state inmate "must exhaust available state remedies thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (internal citation omitted) (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)). "The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court." *Parr v. Quarterman*, 472 F.3d 245, 252 (5th Cir. 2006) (quoting *Smith v. Dretke*, 422 F.3d 269, 275 (5th Cir. 2005)).  The Court of Criminal Appeals is the highest court in the state of Texas for purposes of exhaustion. *Richardson v. Procunier*, 762 F.2d 429, 431 (5th Cir. 1985).

Allen raised a claim of ineffectiveness of counsel but it dealt solely with counsel's purportedly deficient mitigation investigation and the cascading effects of such action.   SHCR 92–109.   The crux of Allen's ineffective assistance claim in state court was that counsel did not find or speak with certain witnesses and this prevented the presentation of certain avenues of mitigation evidence from being presented to the jury or Dr. Cantu.  SHCR 104–09.  Allen, however, did not mention anything regarding the killing of Maciel and how that impacted counsel's effectiveness.  Allen's present claim of ineffective assistance is therefore unexhausted.[3]

As Allen admits, Amend. Pet. 9, an attempt to exhaust this claim in state court would be unsuccessful because his subsequent application would be dismissed as abusive since Allen was required to include all available grounds for relief in his first application.  *Nobles v. Johnson*, 127 F.3d 409, 423 (5th Cir. 1997).  It is well-settled that citation for abuse of the writ by the Court of Criminal Appeals constitutes a procedural default that bars federal

---

[3]    Allen suggests that his punishment stage-related ineffective assistance claim in state court is "global in nature," namely, that it encompasses any action or inaction taken by counsel during the punishment stage.  Amend. Pet. 7.  To the extent that Allen argues that such a "global" ineffective assistance claim is sufficient to exhaust his present claims, he is mistaken.  Instead, "multiple, distinct ineffective assistance claims . . . [are] treated . . . separately."  *Wilder v. Cockrell*, 274 F.3d 255, 261 (5th Cir. 2001). There is a clear difference between the claim presently alleged—preparation for the State's presentation of an extraneous offense—and the claim presented in state court—investigation and presentation of a mitigation case.

habeas review.  *Id.*; *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995).  It is also well-settled that the Court of Criminal Appeals applies the abuse-of-the-writ bar regularly and strictly.  *See Fearance*, 56 F.3d at 642.

The normal rule that a state court must explicitly apply a procedural bar to preclude federal review does not apply to those cases where a petitioner has failed to exhaust his state court remedies, and the state court to which he would be required to present his unexhausted claims would now find those claims to be procedurally barred.  *Coleman*, 501 U.S. at 735 n.1.  In such cases the federal procedural default doctrine precludes federal habeas corpus review.  *Id.*; *Nobles*, 127 F.3d at 423; *Emery v. Johnson*, 139 F.3d 191, 196 (5th Cir. 1997).  Consequently, Allen's ineffective assistance claim as it relates to the Maciel killing is procedurally defaulted.

When a claim has been procedurally defaulted federal review is allowed only when a petitioner has either shown cause and prejudice, or that a fundamental miscarriage of justice will occur but for review of the claim.  *Coleman*, 501 U.S. at 749–50.  Cause exists where "something *external* to the petitioner, something that cannot fairly be attributed to him . . . 'impeded [his] efforts to comply with the State's procedural rule.'"  *Id.* at 753 (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). And a petitioner can invoke the miscarriage-of-justice exception only if he can show that he is actually, as opposed to legally, innocent of the crime or of the death penalty.  *Sawyer v.*

*Whitley*, 505 U.S. 333, 339–40 (1992).  Actual innocence of the death penalty looks to eligibility for a sentence of death, not the jury's discretion in imposing such punishment.  *Id*. at 346–47.

To excuse this procedural default Allen argues that his state habeas counsel's ineffectiveness constitutes cause but Allen does not address prejudice.  Amend. Pet. 8–9.  Allen also suggests that the failure to address this claim on the merits will constitute a miscarriage of justice.  Amend. Pet. 9.  These arguments are insufficient to escape the procedural default incurred by Allen.

The ineffectiveness of state habeas counsel does not constitute cause for purposes of procedural default, *Coleman*, 501 U.S. at 755, and Allen does not address prejudice despite his burden to do so.  Further, Allen does not seriously contend that he is factually innocent of the crime or the death penalty.  As described above, though not exhaustive of the evidence establishing Allen's guilt, Allen's DNA was found mixed with Hill's and Johnson's DNA on the murder weapon and on his body, and his fingerprint was found at the crime scene in Hill's blood—he is not factually innocent of capital murder.  And Allen is not categorically exempt from the death penalty—he is neither mentally retarded nor was he under eighteen at the time of the offense.  Accordingly, Allen cannot escape the procedural default in this case and the claim should be denied with prejudice.

**B.      Counsel were not ineffective in handling the evidence regarding the Maciel killing.**

The familiar standard of *Strickland v. Washington*, 466 U.S. 668 (1984), governs ineffective assistance of counsel claims.    To prove ineffectiveness a petitioner must establish that his counsel's actions were deficient and that such deficiency prejudiced his defense.    *Id*. at 687.    To establish deficient performance a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. There is a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance.    *Id*. at 689. A petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."    *Id*. at 687.

Concerning prejudice, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."    *Id*. at 694. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693. Rather, counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."    *Id*. at 687.    In determining whether a petitioner has shown

prejudice, a reviewing court must "consider *all* the relevant evidence that the jury would have had before it if [the defendant] had pursued a different path—not just the . . . evidence [the defendant] could have presented, but also the . . . evidence that almost certainly would have come in with it." *Wong v. Belmontes*, 130 S. Ct. 383, 387 (2009).

On federal review, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009). Accordingly, "[e]stablishing that a state court's application of *Strickland* was unreasonable . . . is all the more difficult. The standards created by *Strickland* and [AEDPA] are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 131 S. Ct. at 788 (internal citations omitted).

Allen's present claim of ineffectiveness concerning the Maciel killing distorts the trial record, and uses new cases to criticize counsel's actions. First, Allen claims that counsel should have objected to Dr. Bayardo's testimony because Dr. Bayardo did not personally conduct the autopsy of Maciel but testified nevertheless thereby violating the Confrontation Clause. Amend. Pet. 14. He predicates this complaint on *Crawford v. Washington*, 541 U.S. 36 (2004), and its progeny. *Id.* Allen, however, ignores the timing of trial in relation to *Crawford*.

29

Voir dire began on February 17, 2004, and the guilt-innocence stage of trial began on March 10, 2004. 3 RR 4; 13 RR 1. The punishment stage then commenced on March 16, 2004, and Dr. Bayardo testified on March 17, 2004. 17 RR 1; 18 RR 112. *Crawford*, however, was handed down on March 8, 2004—only two days before guilt-innocence, eight days before punishment, and nine days before Dr. Bayardo's testimony. *Crawford*, 541 U.S. at 36. It is remarkable that defense counsel *even learned* of *Crawford* so quickly considering the all-consuming work involved at trial. But not only did they learn of *Crawford*, they *used* it to object to various records. 18 RR 162–64 (objecting to probation records); 19 RR 171–72 (objecting to psychological evaluation).

More importantly, not a single case was handed down in Texas interpreting *Crawford* between March 8, 2004, and March 17, 2004. In the entire United States it appears that only one appellate court even cited *Crawford* in this time frame, and it did not deal with autopsies or extensively discuss the *Crawford* opinion. *People v. Gomez*, 12 Cal. Rptr. 3d 398 (Cal. Ct. App. 2004) (March 8, 2004).[4] Post-trial, multiple Texas appellate courts held that autopsy reports were not testimonial, and because of this *Crawford* was

---

[4] Another case out of California bears an issuance date of March 16, 2004, but its citation to *Crawford* appears to have been made during modification of the opinion on the denial of rehearing, and it, too, did not deal with autopsies. *People v. Conwell*, Nos. A097011, A101881, A101927, 2004 WL 505240 (Cal. Ct. App. Mar. 16, 2004).

not implicated.[5] *E.g., Campos v. State*, 256 S.W.3d 757, 761–63 (Tex. App.—Houston [14th Dist.] 2008); *Mitchell v. State*, 191 S.W.3d 219, 221–22 (Tex. App.—San Antonio 2005); *Moreno Denoso v. State*, 156 S.W.3d 166, 181–83 (Tex. App.—Corpus Christi 2005).

There appears, however, to be a change in Texas law regarding how the Confrontation Clause and autopsy reports interact, but that only occurred in October 2009, five years after Allen's trial, and such reasoning has not yet been adopted by the Court of Criminal Appeals. *See Wood v. State*, 299 S.W.3d 200, 208–10 (Tex. App.—Austin 2009).[6] Even then, an autopsy report is only testimonial if it appears that the report was prepared for prosecutorial use. *See Martinez v. State*, 311 S.W.3d 104, 109–11 (Tex. App.—Amarillo 2010). The point is, however, that no reasonable attorney would have guessed that autopsy reports were implicated by *Crawford* at the time of Allen's trial—indeed, Texas appellate courts held to the contrary for years after Allen's trial—and counsel is not ineffective for their inability to see five years into the future. *See, e.g., Green v. Johnson*, 116 F.3d 1115, 1125 (5th

---

[5] Federal appellate courts, too, held that autopsy reports did not implicate *Crawford* because they were not testimonial. *United States v. De La Cruz*, 514 F.3d 121, 132–34 (1st Cir. 2008); *United States v. Feliz*, 467 F.3d 227, 230–37 (2d Cir. 2006).

[6] Federal appellate courts appear to have recently changed their *Crawford* analysis with respect to the autopsy reports as well. *United States v. Ignasiak*, No. 10-11074, 2012 WL 149314 (11th Cir. Jan. 19, 2012).

Cir. 1997) ("[T]here is no general duty on the part of defense counsel to anticipate changes in the law.").

Second, Allen claims that Maciel's autopsy report was inadmissible because it was hearsay. Amend. Pet. 14. This contention, however, is contrary to Texas evidence law. As the Court of Criminal Appeals has explained:

> An autopsy is a report of a public office which sets forth matters observed pursuant to a duty imposed by law. An autopsy is not, however, a report prepared by law enforcement personnel. It is therefore admissible into evidence as an exception to the hearsay rule under the public records provision of [the Texas Rules of Evidence].

*Butler v. State*, 872 S.W.2d 227, 237–38 (Tex. Crim. App. 1994); *accord Garcia v. State*, 868 S.W.2d 337, 339–42 (Tex. Crim. App. 1993). Under Texas evidence law counsel had no basis to object to the Maciel autopsy report and were not deficient for not doing so. *See, e.g., Premo v. Moore*, 131 S. Ct. 733, 741 (2011) ("[Counsel's] first and independent explanation—that suppression would have been futile—confirms that his representation was adequate under *Strickland*."); *Green*, 116 F.3d at 1125 ("[C]ounsel is not ineffective for failing to raise a claim that Texas courts have rejected repeatedly.").

After dispatching with the erroneous assertions that counsel were ineffective for failing to object to Dr. Bayardo's testimony and the Maciel

autopsy report, it is clear that counsel knew that the State was presenting evidence regarding Maciel's death as a murder.   Clearly, the State gave notice of Maciel's death as an extraneous offense and labeled it a "murder." CR 168.   Further, Maciel's daughter, various police officers, and several witnesses testified regarding Maciel's killing without objection or surprise. 18 RR 2, 6, 22, 35, 49, 73.   Counsel competently cross-examined these witnesses and pointed out that Allen had not been convicted of murder for Maciel's death, that Maciel was arguing with Allen before the fight, and that Maciel had a knife on him when he died, implicating a death in the course of self defense or, at worst, an accidental killing during a mutual fight. 18 RR 19, 45, 69.   Further, when cross-examining Dr. Bayardo, counsel got him to admit that Maciel was extremely intoxicated at the time of his death, and that there was no "forensic probability" that Maciel was hit from behind.  18 RR 125–26, 128.

To the extent that there was any surprise regarding Maciel's death it was not that the killing was a murder, but that Maciel had been hit from behind instead of from the front.  20 RR 3–4 ("The second thing is they have insisted repeatedly in oral argument and in questioning that this man was struck in the back of the neck.  Dr. Dana's testimony will make it clear that that simply is not true.").   But counsel is not entitled to the prosecutors' theory of the murder—struck from behind or from the front—and counsel

33

admitted that "[t]o anticipate every evidentiary need as the defense is almost impossible."   20 RR 3; *see Richter*, 131 S. Ct. at 791 ("Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities.").

When confronted with the new factual theory of murder counsel were able to get Dr. Bayardo to admit that he could not testify with any "forensic probability" that Maciel was struck from behind, and counsel moved to introduce the prior testimony of Dr. Dana, who did not testify that Maciel was hit from behind.  18 RR 128; 20 RR 4.  The prosecutors objected that the prior testimony was hearsay which the trial court noted might be "legally correct on the objection." 20 RR 1, 5.   It was not until the end of the punishment stage of trial that counsel stated that they would be ineffective if the transcript was not admitted—clearly a last-ditch effort to make admissible a piece of evidence that was probably, technically, inadmissible. 20 RR 242.  Ultimately, the trial court found that the transcript of Dr. Dana's prior testimony was admissible and counsel published it to the jury.  20 RR 244–46; DX 3.   In the transcript, Dr. Dana did not mention Maciel being struck from behind.

As counsel stated, no attorney can plan for all of the exigencies of trial but counsel clearly knew of Maciel's death and rebutted it with strong cross-

examination and evidence.  *See Richter*, 131 S. Ct. at 791 ("In many instances cross-examination will be sufficient to expose defects in an expert's presentation.").  Indeed, Allen does not even state what action counsel should have taken differently than what counsel did at trial.  Counsel were not deficient.

Moreover, even if they were deficient, there was no prejudice.  To counter the evidence of Maciel's murder the best that counsel could do was undermine the theory that Maciel had been hit from behind; counsel did that through the cross-examination of Dr. Bayardo, and the introduction of Dr. Dana's prior testimony.  *Id.* at 792 (no prejudice where defense counsel "extracted a concession" from the expert undermining the expert's opinion).  And ultimately, whether Maciel died as a result of a murder or aggravated assault is really immaterial—Allen admitted that he fought with Maciel and that fight led to Maciel's death over a $10.00 debt and a chain.  There is no reasonable probability of a different result if the jury believed that Allen struck Maciel while facing him instead of from behind.  And to the extent that this Court believes the claim is exhausted, which Allen asserts, Amend. Pet. 7, the state court's denial of relief was not objectively unreasonable in light of then-existing Supreme Court precedent.

## II.   Allen's Claim That Trial Counsel Did Not Adequately Challenge the Testimony of Dr. Richard Coons Is Unexhausted and Procedurally Defaulted, and it Is, Regardless, Without Merit.

Allen claims that counsel were ineffective because they did not "zealously" challenge the admissibility of Dr. Richard Coons's testimony regarding future dangerousness.  Amend. Pet. 18–19.  Allen takes particular offense to counsel's stipulation of Dr. Coons's qualifications, and the fact that counsel only challenged the subject matter of Dr. Coons's testimony.  *Id*. at 19–21.   Allen apparently believes that had counsel more vigorously challenged Dr. Coons's testimony he could have prevailed in keeping it out of evidence, or won on appeal.  *Id*. at 21–23.  Finally, Allen believes that Dr. Coons's testimony was prejudicial.  *Id*. at 23–26.

Again, Allen misconstrues the record regarding counsel's actions with respect to Dr. Coons, and uses the benefit of hindsight to make an argument that counsel should have acted in a different manner.  At any rate, the claim is unexhausted and procedurally defaulted as a result.   The claim should consequently be denied with prejudice.

### A.   Allen's claim concerning counsel's challenge to Dr. Coon's is unexhausted and procedurally defaulted.

As noted above, exhaustion of a claim in the state forum is necessary for a federal court to consider the claim's merits.  *See supra* Section I(A).  Allen did not at all challenge counsel's actions with respect to Dr. Coons in

his state habeas application.  Rather, Allen focused on an allegedly deficient mitigation investigation.  SHCR 92–109.  Allen's present claim of ineffective assistance is therefore unexhausted.[7]

As Allen concedes, Amend. Pet. 9, an attempt to exhaust this claim in state court would be barred as abusive, *Nobles*, 127 F.3d at 423, and such state law ground is an adequate and independent bar to federal review, *Id.*; *Fearance*, 56 F.3d at 642.  Further, the probable application of such a bar constitutes a procedural default preventing federal court consideration of the claim's merits.  *Coleman*, 501 U.S. at 735 n.1; *Nobles*, 127 F.3d at 423; *Emery*, 139 F.3d at 196.  Accordingly, Allen's ineffective assistance claim, as it relates to Dr. Coons, is procedurally defaulted.

As described above, a petitioner can avoid a procedural default by showing cause and prejudice, or a miscarriage of justice.  *See supra* Section I(A).  Again, Allen globally attempts to avoid the impact of this procedural default by arguing that his state habeas counsel should be blamed for failing to raise this claim, or that a miscarriage of justice will occur if the claim is

---

[7]   Allen argues against procedural default universally, and suggests that his punishment stage-related ineffective assistance claim in state court is "global in nature."  Amend. Pet. 7.  As explained earlier, claims of ineffective assistance are focused on discrete actions or inactions, and a global claim of ineffectiveness does not suffice to exhaust claims.  *See supra* Note 3.  There is a clear distinction between a deficient mitigation investigation and challenging the scientific reliability of a specific expert.

not reviewed on the merits.  Amend. Pet. 8–9.  Such arguments do not eliminate the impact of the procedural default in this case.

Ineffective assistance of postconviction counsel is not cause, *Coleman*, 501 U.S. at 755, and Allen has not addressed prejudice in the context of a procedural default.  Further, Allen is not factually innocent of capital murder or the death penalty, as explained above.  *See supra* Section I(A).  Accordingly, Allen cannot escape the procedural default in this case, and the claim should be denied with prejudice.

## B. Counsel were not ineffective in challenging the admissibility of Dr. Coons's testimony regarding future dangerousness.

Allen again distorts the trial record to make counsel look inept, and he relies upon appellate cases decided years after trial to challenge counsel's actions regarding Dr. Coons.  Initially, counsel filed an extensive motion in limine to exclude testimony regarding the probability of future dangerousness.  CR 50–78.  In summary, counsel argued in the motion that such expert opinions were not reliable because of "(a) their overwhelming rate of error; (b) their lack of acceptance in the relevant scientific community; (c) the subjective, inconsistent, ad-hoc, and standardless manner in which they are formed; [and] (d) the absence of a proper and adequately reliable data source upon which to base them."  CR 51.  The motion in limine was denied

38

during a pretrial hearing about a week before the guilt-innocence stage commenced.  12 RR 7–8.

Before the punishment stage began counsel stated that the challenge to Dr. Coons would be "cursory," and "largely symbolic" given the then-present status of the law.   19 RR 91, 164.   Counsel waived the challenge to Dr. Coons's credentials, and the prosecutors questioned Dr. Coons about the documents he reviewed, whether it was possible to make a determination about future dangerousness, and how often Dr. Coons had testified as an expert witness. 19 RR 164–69.   On cross-examination counsel asked Dr. Coons what methodology he employed in coming to a conclusion regarding future dangerousness, and Dr. Coons explained his process.  19 RR 173–74. Based on his answer, counsel objected for the reasons stated in the motion in limine.  19 RR 174–75.  The trial court presciently ruled in the following way:

> Well, I guess this is an area where I do believe currently that Texas law permits it, though I have serious concerns about whether in the future—you know, I keep worrying that the case will arise or some learned—more learned appellate court is going to decide it's not admissible.  So I think the State is taking a gamble, but I think currently the law permits it, though I would not place my money on the fact that at some point in the future it may not.  So—but adhering to the current status of the law, we'll deny the defense motion.  I guess that it's up to the State.

19 RR 175–76.  Dr. Coons was permitted to testify before the jury and stated that he thought Allen would be a future danger based on a hypothetical encompassing many facts of Allen's history.  19 RR 187.

Allen's argument is almost entirely predicated on a change in the law that occurred some six years after trial in *Coble v. State*, 330 S.W.3d 253, 270–80 (Tex. Crim. App. 2010), *cert. denied Coble v. Texas*, 131 S. Ct. 3030 (2011), where Dr. Coons's testimony was found to be not scientifically reliable.  But this is exactly the type of hindsight that cannot be considered in assessing counsel's effectiveness *at the time of trial*, which *Strickland* demands.  *Strickland*, 466 U.S. at 689.  More importantly, it ignores the result of Allen's direct appeal:

> Even if appellant had preserved the issue for appeal, the trial court did not err in admitting Dr. Coons'[s] testimony.  Dr. Coons testified before the jury as to his qualifications and expertise.  He reiterated his testimony given outside the jury regarding the materials he had reviewed.  He testified that if there is enough data, it is possible to reach a conclusion about whether there is a probability that someone will commit criminal acts of violence that would constitute a continuing threat to society, and he reiterated the criteria he looked at with regard to appellant.
>
> We have held that psychological and psychiatric testimony is admissible during the punishment phase of a capital trial.  Moreover, we have repeatedly recognized that testimony from mental health experts is relevant to the issue of future dangerousness.  Although Dr. Coons did not conduct an individual clinical interview, there is no such prerequisite to give his expert opinion on future dangerousness.  Given the record made by Dr. Coons and the relevance of his testimony, the trial court did not abuse its discretion in admitting his expert testimony.

*Allen*, 2006 WL 1751227, at *6 (footnotes omitted).  As the Court of Criminal Appeals noted, testimony on future dangerousness had long been ruled

admissible in Texas. *Id.* at *6 n.42. And following Allen's appeal expert testimony on future dangerousness was repeatedly upheld, including Dr. Coons's testimony specifically. *Davis v. State*, 313 S.W.3d 317, 352–54 (Tex. Crim. App. 2010) (Drs. Self and Allen); *Russeau v. State*, 291 S.W.3d 426, 437–38 (Tex. Crim. App. 2009) (Dr. Gripon); *Gonzales v. State*, No. AP-75540 2009 WL 1684699, at *6 (Tex. Crim. App. June 17, 2009) (Dr. Gripon); *Ramey v. State*, No. AP-75678, 2009 WL 335276, at *14–*15 (Tex. Crim. App. Feb. 11, 2009) (Dr. Coons); *Espada v. State*, No. AP-75,219, 2008 WL 4809235, at *8–*9 (Tex. Crim. App. Nov. 5, 2008) (Dr. Coons). Counsel appropriately challenged the subject matter of Dr. Coons's testimony[8] by using an incredibly detailed brief to support the argument, the basis of which was largely adopted by the Court of Criminal Appeals in *Coble*. Counsel's actions, in light of the status of the law at the time of trial, were not deficient. *See, e.g., Green*, 116 F.3d at 1125 ("[C]ounsel is not ineffective for failing to raise a claim that Texas courts have rejected repeatedly.").

Assuming, however, deficiency on the part of counsel there is no reasonable probability of a different result. Indeed, the Court of Criminal

---

[8] Despite Allen's protestation otherwise, Amend. Pet. 22 n.6, counsel had no basis to challenge Dr. Coons's expertise. As the Court of Criminal Appeals noted, "there is no question that Dr. Coons is a genuine forensic psychiatrist with a lengthy medical career." *Coble*, 330 S.W.3d at 277. Indeed, Allen's own expert psychiatrist stated that Dr. Coons was "absolutely" a "very well respected psychiatrist." 20 RR 232.

Appeals held that Dr. Coons's testimony was admissible on appeal, and did so for years after Allen's trial.  *Allen*, 2006 WL 1751227, at *6.  There can be no clearer proof that counsel's actions were not prejudicial if such actions were, in fact, deficient.[9]

And, in any event, Dr. Coons's testimony was not particularly important nor was it emphasized by the prosecution.  As explained above, Allen carried out acts of unspeakable brutality, the effects of which were repeatedly likened to car crashes.  In addition to the savage killings of Hill and Johnson, Allen also beat his former wife Darlene nearly to death, and Allen threw Darlene's daughter out of a window when she tried to intervene. He also killed a man with his bare hands over something as petty as a $10.00 debt and a chain, had previously injured another girlfriend, and had a significant number of convictions.  In addition, while awaiting trial on capital murder—a period that one would expect the best of behavior—Allen beat a mentally ill man and fought another man in jail, and expressed little remorse over the killing of Hill and Johnson.  This testimony spanned approximately 350 pages while Dr. Coons's direct testimony was a little less than twenty

---

[9]  Allen suggests that if counsel had tried harder in challenging Dr. Coons's testimony the trial judge may have excluded it.  Amend. Pet. 21.  The trial judge was clearly troubled by Dr. Coons's proposed testimony but felt duty-bound, as it must, to the rulings of a higher court.  19 RR 175–76.  What Allen seeks is a "lawless decisionmaker" for purposes of *Strickland* prejudice—a judge who would exclude Dr. Coons's testimony despite the repeated blessings by appellate courts. Allen, however, is not so entitled to such "luck."  *Strickland*, 466 U.S. at 695.

pages, and primarily in the form of a long, drawn-out hypothetical.  Counsel also refuted Dr. Coons's testimony by presenting evidence that Allen would have little chance to be violent in a TDCJ prison, and that the American Psychiatric Association opposed the use of psychiatry in assessing future dangerousness.  Finally, the prosecutors referenced Dr. Coons's testimony only twice during closing arguments, and each reference was fleeting.  21 RR 9, 49.  Given the evidence before the jury, there is no reasonable probability of a different result if Dr. Coons's testimony is removed from the mix.  And, to the extent that this claim is exhausted as Allen asserts, Amend. Pet. 7, the denial of relief was not an objectively unreasonable application of Supreme Court precedent.  The claim should therefore be denied with prejudice.

### III.   Allen's Claim That Trial Counsel Did Not Properly Prepare Their Psychiatric Expert, Dr. Robert Cantu, Is Unexhausted and Procedurally Defaulted, and, Alternatively, Without Merit.

Allen maintains that counsel were deficient because they failed to adequately make ready their expert psychiatrist, Dr. Robert Cantu.  Amend. Pet. 26–31.  Specifically, counsel were allegedly deficient because they did not provide Dr. Cantu with three things: "directions, data, and actual access to Mr. Allen." *Id.* at 26.  What Allen means by "directions" is not quite clear but it appears to be a challenge to counsel's decision to hire Dr. Cantu but not have him "opine on the impact [of] Mr. Allen's mental health . . . or provid[e] any other testimony that could be considered as mitigation evidence." *Id.* at

43

27.  And Allen faults counsel for not giving Dr. Cantu access to Allen's mental "health records" or Allen himself to conduct a "clinical interview or testing." *Id*. at 30.  Allen claims that these decisions were prejudicial.  *Id*. at 31.

Like his prior claims of ineffective assistance Allen has not fairly presented this claim in state court.  Nevertheless, it is clear that counsel had a reasonable, strategic basis for employing Dr. Cantu in the manner that they did; had they taken Allen's proposed course the State would have had direct access to Allen through psychological or psychiatric examination thus providing them with even more damning evidence for the punishment stage.  As such, the claim should be denied with prejudice.

### A.  Allen's claim of ineffectiveness, as it relates to Dr. Cantu's preparation, is unexhausted and procedurally defaulted.

Mentioned earlier, a petitioner must fairly present his claim to the state courts in order for it to be addressed on the merits in federal court.  *See supra* Section I(A).  In state court Allen only challenged the propriety of counsel's investigation into mitigating evidence.  SHCR 92–109.  While Dr. Cantu was mentioned in this claim it was in the context of the *effect* that the supposedly insufficient investigation had on Dr. Cantu's performance—prejudice—not specific challenges to counsel's decision to utilize Dr. Cantu in a particular manner, provide him with certain documents or allow him to personally examine Allen.  The state claim implicates a defective action while

44

the federal claim concerns strategic omissions—they are distinctly different claims, and the latter was not presented to the state court. Accordingly, the present claim of ineffective assistance for deficiently preparing Dr. Cantu is unexhausted.[10]

As Allen notes, Amend. Pet. 9, an attempt to exhaust this claim in state court would be barred by Texas's abuse-of-the-writ statute, *Nobles*, 127 F.3d at 423, and such state law ground is an adequate and independent bar to federal review. *Id.*; *Fearance*, 56 F.3d at 642. Additionally, the likely application of such a bar procedurally defaults a claim in federal court thereby prohibiting an adjudication on the claim's merits. *Coleman*, 501 U.S. at 735 n.1; *Nobles*, 127 F.3d at 423; *Emery*, 139 F.3d at 196. Resultantly, Allen's ineffective assistance claim regarding Dr. Cantu is procedurally defaulted.

Also, as described above, a petitioner can avoid a procedural default by showing cause and prejudice, or a miscarriage of justice. *See supra* Section I(A). Again, Allen globally attempts to avoid this procedural default by

---

[10]   Again, Allen argues that the punishment-based ineffective assistance claim he presented in state court is "global in nature" thereby exhausting the present claim. Amend. Pet. 7. As discussed above, however, claims of ineffective assistance are action- or inaction-specific, and a global claim of ineffectiveness does not exhaust all future claims. *See supra* Note 3. There is a clear distinction between a purportedly poor investigation into mitigating evidence and challenging counsel's actions in using an expert in a specific way, or providing him with certain evidence.

claiming that his state habeas counsel was ineffective for not raising this claim, or that a miscarriage of justice will occur if the claim is not given a merits review. Amend. Pet. 8–9. These contentions do not allow Allen to avoid the procedural default in this case.

Cause is not established through ineffective assistance of state habeas counsel, *Coleman*, 501 U.S. at 755, and Allen has not addressed prejudice in the context of a procedural default although it is his burden to do so. Moreover, Allen is not factually innocent of capital murder or the death penalty, as explained earlier. *See supra* Section I(A). Hence, Allen cannot prevent the procedural default in this case, and the claim should be denied with prejudice.

## B. Counsel had reasonable and strategic bases for utilizing Dr. Cantu in the manner they did, and no prejudice resulted from such actions.

Like Allen's other claims of ineffective assistance this claim offers a revisionist take on the events at trial. More than a year before trial the State sought to discover Allen's expert witnesses, if any. CR 107. Shortly before trial the State sought to have Allen personally examined by its mental health expert if Allen intended "to use the testimony of any mental health expert" at trial. CR 144–45. Then, at the first transcribed hearing in the case, the State brought up the motion to examine Allen. 2 RR 10. Counsel delayed providing notice of the intent to introduce psychiatric or psychological expert

testimony because they had not yet chosen an expert at the time.  2 RR 10–

11.  At the final pretrial hearing, counsel stated the following:

> In that regard, your Honor, there is one other matter.  One of the experts that I noticed to the State is Dr. Robert Cantu.  I told the State that this expert is not going to examine the defendant, converse with the defendant, nor is he going to examine any of the medial records or treatment histories for the defendant.  I think the State is relying on that statement by the defense, and I just wanted to get it into the record.

12 RR 5; *accord* Supp. SHCR 251 (finding rr).  While the record does not

explicitly indicate whether Allen was examined by the State's expert he

clearly was not as evinced by the fact that no such testimony was presented

at trial.

At the punishment stage the prosecutors sought an outside-the-

presence-of-the-jury hearing to determine the admissibility of Dr. Cantu's

proposed testimony.  20 RR 127.  Dr. Cantu stated that he would not be

offering testimony on future dangerousness, that he would base his opinions

on an oral history of Allen and hypothetical questions posed by counsel, and

that he would not state whether particular evidence was mitigating or not.

20 RR 127–29.  The prosecutors asked what information Dr. Cantu had relied

upon in forming an opinion, and whether he had personally interviewed

Allen.  20 RR 129–32.  The prosecutors ultimately did not challenge the

admissibility of Dr. Cantu's proposed testimony.

Dr. Cantu then testified before the jury, and again stated that he was not offering an opinion on future dangerousness because he thought, along with the American Psychiatric Association, that such opinions were improper. 20 RR 191–92. Dr. Cantu also stated that he would not be giving an opinion on whether any particular item of evidence was mitigating or not, and would be providing answers based on hypothetical questions, which Dr. Cantu testified was quite common in the practice of psychiatry. 20 RR 191–93. Dr. Cantu was then given a hypothetical incorporating Allen's life history, and provided the jury with an explanation regarding why Allen could be so explosively violent, in particular towards women, and stated that Allen was not beyond repair.[11] 20 RR 197–204.

Undoubtedly, prosecutors were hoping to have Allen examined by their own expert. They promptly asked whether Allen was going to utilize expert testimony, and repeatedly requested personal access to Allen if he chose to do so. CR 107, 144–45; 2 RR 10. At the time of Allen's trial Texas law was clear—if the defendant submits to a personal psychiatric or psychological

---

[11] Contrary to Allen's suggestion that "it is difficult to find any reasonable and rational basis for seeking Dr. Cantu out and offering any testimony from him," it is quite clear that counsel utilized Dr. Cantu for at least three reasons: (1) an opinion that future dangerousness could not be predicted by mental health experts; (2) that Allen's abusive upbringing explained, but did not excuse, his violent behavior; and (3) that Allen could receive meaningful treatment if given a life sentence. 20 RR 191–93, 197–204. As explained below the information provided to Dr. Cantu was purposefully restricted by counsel in order to avoid the introduction of damning rebuttal evidence by the State.

examination by his own expert the defendant must do the same with the State's expert as a condition precedent to admissibility of his expert's testimony.  *E.g., Chamberlain v. State*, 993 S.W.2d 230, 233–34 (Tex. Crim. App. 1999) ("The holdings of *Soria* and *Lagrone* are governed by the principle that if a defendant breaks his silence to speak to his own psychiatric expert and introduces that testimony which is based on such interview, he has constructively taken the stand and waived his fifth amendment right to refuse to submit to the State's psychiatric experts.").   Allen's counsel purposefully and reasonably avoided this course of action because no good would come of it.

Counsel, during the live state habeas evidentiary hearing, explained the decision to avoid a personal psychiatric or psychological examination of Allen:

> I felt that we would lose ground if he were to have actually met and spoken to Guy.  It's very hard for someone who is familiar with this case to understand that I can sit here and say I like Guy Allen.  I also think that Guy Allen is one of the most explosively dangerous human beings I've ever known in my life.
>
> And the problem with having an expert interact with your client is that the expert is bound to make truthful answers and you may then create an expert who helps you and damages you at the same time.  And I've been in that position many years ago when I unwittingly set myself up for the fact that you get the good and the bad and the ugly when you have an expert examine your client.
> . . . .

> I think it is safe to say that I had, based on all my experience—and I stretch it is well back more than 30 years as a trial lawyer working on many occasions with clients who were, if not psychopathic but very certainly sociopathic, people who have that ability to become dangerous in an instant, to engage in incredible acts of violence and then subside into being seemingly normal people.  No, I didn't want that to happen.

1 Supp. SHTr. 146–47; *accord* 1 Supp. SHTr. 93–94 (Dr. Cantu did not personally examine Allen "because otherwise then we would have been exposing ourselves to a whole lot of testimony and examinations by the State and that was the purpose to restrict the State's access to Mr. Allen.  Had we had a psychiatric expert examine Mr. Allen the State would have been entitled to do the same and we didn't want Dr. Coons in there."); Supp. SHCR 251 (findings pp & qq).   And counsel's interaction with Allen wasn't superficial or limited to this case—counsel had represented Allen in the Maciel killing, and the assault of Darlene and Megan.  1 Supp. SHTr. 112–13.

Further, counsel were in possession of a psychological evaluation of Allen conducted as part of Allen's probation for the Maciel killing.  3 Supp. SHTr. 622–24.[12]   The report contains, among other things, the following problematic information: Allen had an "Other Than Honorable discharge"

---

[12]   State habeas counsel introduced counsel's trial file as Exhibit 13 during the live evidentiary hearing.  1 Supp. SHTr. 80–81.  State habeas counsel did not label this exhibit, however, though it appears to be the documents found in volumes two and three of the supplemental state habeas transcript.  2 Supp. SHTr. 278–443; 3 Supp. SHTr. 444–643.  To be sure, Exhibit 12 is the last set of documents in volume one, 1 Supp. SHTr. 269–75, and Exhibit 14 is the first set of documents in volume four, 4 Supp. 646–717, located just before and after the documents found in volumes two and three of the supplemental state habeas transcript.

from the Army because of "a dirty urinalysis;" Allen admitted to using marijuana, cocaine, crack cocaine, and speed; Allen had a history of assaulting his girlfriend; Allen "possesses a great [deal] of anger. He is also impulsive. His anger may lead him, therefore, to episodic acting out;" Allen "tends to rationalize and transfer blame to others, without accepting responsibility for his own behaviors;" Allen "possesses much in common with individuals known to be violent;" Allen "takes no responsibility" for a child that he doesn't believe to be his; Allen hadn't seen his acknowledged children for three years; and Allen "does not exhibit empathy toward his victim." 3 Supp. SHTr. 622–24. This damning condemnation of Allen is undeniably the reason that the prosecutors repeatedly attempted to introduce the report as evidence, and the reason they wanted to have Allen personally examined. 18 RR 147–48; 19 RR 4–7, 204–211; 20 RR 229. Counsel, however, were successful in keeping the report out of evidence. 20 RR 229.

Similarly, counsel were able to keep out certain portions of Allen's probation and parole files, along with his military records, providing unfavorable evidence including Allen's criminal history, "military drug cases," and facts bolstering the theory that Allen had struck Maciel from behind. 18 RR 144–50, 152–57, 161; 21 RR 60. On cross-examination Dr. Cantu confirmed that he had not read the probation or parole files, or military records. 20 RR 215. Had he considered such documents the

prosecutors would have surely required Dr. Cantu to disclose the underlying facts and data that he relied upon. Tex. R. Evid. 705(a); *see, e.g., Nenno v. State*, 970 S.W.2d 549, 562–64 (Tex. Crim. App. 1998) (State was allowed to cross-examine expert who relied upon a report despite the fact that the report was inadmissible), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720 (Tex. Crim. App. 1999). Counsel's desire to keep such documents from entering into evidence would have been inconsistent with, and undermined, counsel's trial strategy had Dr. Cantu considered them.

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. Presenting or withholding certain evidence is clearly within counsel's reasoned, strategic discretion. *See, e.g., Darden v. Wainwright*, 477 U.S. 168, 185–86 (1986) (counsel reasonably withheld most of the defendant's available mitigation evidence). And counsel may reasonably choose to avoid certain avenues of evidence in an attempt to limit the State's rebuttal. *See, e.g., Strickland*, 466 U.S. at 699 ("Restricting testimony on respondent's character to what had come in at the plea colloquy ensured that contrary character and psychological evidence and respondent's criminal history . . . would not come in."). It follows that counsel should be able to limit the evidence an expert considers to achieve the same result. *Cf. Richter*, 131 S.

Ct. at 789–90 ("An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense.").

Here, counsel made an informed choice to keep certain, inadmissible facts out of evidence by restricting Dr. Cantu's access to Allen and the documentation of his life. Supp. SHCR 252 (conclusion b). Counsel may have given up something to accomplish this—the impression that Dr. Cantu was fully informed because he had not considered certain documents—but counsel gained something as well—beneficial psychiatric testimony—while preventing the jury from hearing damning evidence not otherwise introduced. This strategic choice is not simply a lack of "directions" to or preparation of Dr. Cantu as Allen suggests, but a consequence of the law at the time of trial. *See Yarborough v. Gentry*, 540 U.S. 1, (2003) (per curiam) ("[T]here is a strong presumption that [counsel took certain actions] for tactical reasons than through sheer neglect.").

Indeed, counsel met with Dr. Cantu on multiple occasions and explained to him that he was going to be utilized albeit in a limited fashion. 20 RR 127–29 ("So you understand that the only and the sole function you have is to answer those questions based on the history and the hypothetical if and only if there is a psychiatric basis for answering those questions."). As such, counsel was not deficient. *See, e.g., Pinholster*, 131 S. Ct. at 1410 ("If Pinholster had called Dr. Woods to testify consistent with his psychiatric

report, Pinholster would have opened the door to rebuttal by a state expert."); *Crane v. Johnson*, 178 F.3d 309, 314 (5th Cir. 1999) (counsel were not ineffective for avoiding the presentation of psychiatric evidence which would have provoked strong rebuttal by the State); *cf. Miller v. Anderson*, 255 F.3d 455, 458 (7th Cir. 2001) (counsel was ineffective for calling an expert who was destroyed on cross-examination by extraneous offenses not otherwise admitted at trial), *judgment modified* 268 F.3d 485 (7th Cir. 2001).

Moreover, Allen has not shown that counsel's actions caused him prejudice. Allen has not pointed to any evidence suggesting that a psychiatric or psychological examination of Allen would have produced anything of benefit—indeed, Allen's prior psychological evaluation shows more harm than good—nor has he identified any documents describing Allen's positive attributes that Dr. Cantu could have relied upon. Failure to do either forecloses a finding of prejudice. *See Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) (a petitioner must name the witness, prove that the witness would have been available to testify, allege what the witness's testimony would have been, and explain how the proposed testimony would have been beneficial). Further, if this claim is exhausted as Allen posits, Amend. Pet. 7, the denial of relief was not an objectively unreasonable application of Supreme Court precedent. Consequently, the claim should be denied with prejudice.

54

**IV.  Allen's Claim That Trial Counsel Were Ineffective In Their Mitigation Investigation and Resulting Presentation at Trial Is Without Merit.**

In Allen's final—and only exhausted—claim of ineffective assistance he alleges that counsel failed to investigate and present a sufficient mitigation case.  Amend. Pet. 31–58.  Allen's complaint appears to be that counsel deferred too much to their mitigation specialist, and spent insufficient time investigating Allen's life.  *Id*. at 32, 45–46, 49–50, 52–53.  Allen claims that had counsel interviewed and presented the testimony of certain individuals, along with various documents, this would have led to a different outcome.  *Id*. at 53–58.

Allen's arguments gloss over the fact that counsel did exactly what they should have done in preparing a mitigation case—they hired an expert to dig up Allen's life history, they constantly reviewed such information, and they made the choice about which evidence to present or withhold.  Further, Allen ignores the fact that not only he, but his family, blocked counsel's efforts to discover potentially mitigating history about his past.  Ultimately, however, Allen's "undiscovered" mitigating evidence is neither the type nor quantity necessary to alter the outcome of trial considering both the State's and Allen's evidence before the jury.

Allen was arrested on the eve he committed capital murder, April 3, 2002.  14 RR 3–8.  Counsel were appointed on April 8, 2002, and April 14,

55

2002, respectively.  CR 18–19; 1 Supp. SHTr. 10.  A year before trial counsel moved for appointment of a mitigation specialist to: (1) investigate Allen's background, "and evaluate the dynamics of his family;" (2) obtain releases for confidential records; (3) "identify, obtain and evaluate" records in "public and private institutions;" (4) "assist counsel in locating, documenting and obtaining any evidence that would bear on the personal moral culpability" of Allen; and (5) "assist counsel in the preparation and presentation of" mitigation evidence.  1 Supp. SHTr. 22–23, 163–71; *see* 1 Supp. SHTr. 174 (retention letter to the mitigation specialist).  Counsel moved for appointment of the particular mitigation specialist requested because he had "worked with a number of capital attorneys in Austin, Travis County and throughout the State who all recommended him very highly," and also because counsel "heard him speak at professional seminars dealing with capital defense."  1 Supp. SHTr. 24; *accord* 1 Supp. SHTr. 111 ("And the reason we hired him is that he probably had the best reputation locally for giving very good work as a mitigation specialist.").  Funding was approved on the same day the motion was filed.  1 Supp. SHTr. 172–73.

Counsel summarized the mitigation specialist's role as "I guess you could say as a fact investigator on the punishment part of the trial."  1 Supp. SHTr. 25; *accord* 1 Supp. SHTr. 112 ("His duties were to gather and present as much evidence as he felt would pertain to the issue of mitigation.").  He

56

was employed to find mitigation witnesses, "identify them, talk with them, [and] develop testimony," 1 Supp. SHTr. 26, and he obtained Allen's "military records, social security records, [school] records, [and] Texas Department of Criminal Justice disciplinary records." 1 Supp. SHTr. 31. All of this material was provided to counsel, and he maintained contact with counsel when pertinent. 1 Supp. SHTr. 25–26, 41, 112. The mitigation specialist created a "life history outline" of Allen for counsel,[13] but most information was provided to them verbally. 1 Supp. SHTr. 92, 180–81, 113. The decision on what material or facts to introduce during the punishment stage of trial was ultimately counsel's decision. 1 Supp. SHTr. 85–86.

After reviewing the available information regarding Allen's history counsel decided on the following mitigation strategy: "[e]xtreme abuse, egregious neglect, grinding poverty and humiliating, degrading sexual abuse." 1 Supp. SHTr. 35; *accord* 1 Supp. SHTr. 119–20. And it was Allen's history that was paramount, not the history of various distant relatives. 1 Supp. SHTr. 86. Counsel explained their decision to focus on Allen:

> Because ultimately the special issue that the jury has to answer deals with the defendant and it's the dynamics that go into his past and probable future behavior that are the relevant

---

[13]  There are actually two slightly different "life history outlines" of Allen in the record. 1 Supp. SHTr. 180–81; 4 Supp. SHTr. 742–43. The latter document is nearly identical to the earlier but provides instances where Allen received medical treatment thus demonstrating that the mitigation specialist also obtained hospital records. 4 Supp. SHTr. 742–43.

facts.  You know, the collateral causes of those dynamics may be interesting to professionals but for a lay jury you want to—the whole purpose of mitigation is to give a picture of the human being himself that they have to answer the life or death question on.

1 Supp. SHTr. 86.

In order to present the history of Allen's life counsel called his brother Steve Allen.  20 RR 134.  That counsel called only a single witness regarding Allen's background was not a choice of their own doing—Allen's family was "[e]xtremely" uncooperative, and provided almost no information to counsel. 1 Supp. SHTr. 93; *accord* 1 Supp. SHTr. 120 ("The problem we had and that [the mitigation specialist] shared with us from the start was that he was not getting any feedback from the members of [Allen's] family, his extended family, that they wouldn't talk."), 137, 152.  Counsel were, in fact, surprised because they "had difficulty getting anybody to cooperate with us and Steve finally came forward and agreed to share this very personal and difficult story.  We were grateful for it."  1 Supp. SHTr. 93.

Allen, too, hampered counsel's ability to develop a mitigation case. Counsel explained:

Guy Allen is in my opinion a relatively bright, capable guy. He can be funny, engaging, amusing.  He has a complete grasp of where he is, what's going on and we never had in any of my dealings with Guy, stretching years before my involvement with this case, any trouble at all in communicating.  That has never been a barrier.

58

The limit on our communication if any is that when it came to personal history Guy was an absolute stonewall. Every time that I raised mitigation with Guy, every time I reminded him that in my opinion he was a perfect candidate for death row unless we found the reasons to persuade a jury that he deserved some consideration that he should not have the death penalty inflicted, he just wouldn't talk. What little we did learn, and it wasn't much, never came as a result of any communication I had with Guy. It came because [the mitigation specialist] somehow got it.

The single most frustrating part of representing Guy in this death penalty case is that what in my mind was the single most important issue, mitigation, was an absolute stonewall. We never even went back to the Court to request additional money because as [the mitigation specialist] put it in one meeting I don't know what else to do. I don't know who else we talk to. I don't know what more to get. The only witness we got, Mr. [Steve] Allen . . . we got literally 6 or 7 days before trial. I'm not sure we didn't get him during trial. I mean that was that—it was that difficult and it was—it was a study in absolute frustration. We did rely heavily on [the mitigation specialist] but I remember a meeting when he said, you know, if they won't talk, if we can't communicate, if they won't come forward, he said, there's nothing more to do here. I can't get it.

In fact, I think now as I'm speaking to it I remember that we didn't have one single witness until after trial began. It was only when the trial began that Steve came forward because he realized this was really going to happen and then only very begrudgingly. And I think it was on Saturday during trial we met at the office and he began relating what I though was this terribly horrific talk.

1 Supp. SHTr. 137–38. And despite insinuations from Allen that counsel's "stonewalling" explanation is some post hoc rationalization covering up a "minimal amount of work," Amend. Pet. 33, evidence arising before the state

habeas hearing corroborates counsel's explanation.   Indeed, Steve Allen explained at trial:

> [Counsel]:   Was it difficult for you to come forward and speak to this jury today?
>
> [Steve]:   Harder than you think.
>
> [Counsel]:   The things that you've told this jury—
>
> [Steve]:   Something I was never supposed to tell.
>
> [Counsel]:   Are these things you even discuss inside your family?
>
> [Steve]:   Never.  They never get brought up.  They never get mentioned.  They never get talked about.  They never get hinted about.  Something that was supposed to stay hidden.
>
> [Counsel]:   Were you encouraged not to tell?
>
> [Steve]:   For—yeah, they told me not to say anything.  If [the mitigation specialist] would come by and send a message on, I was not to talk to him for any reason.  Or any one of the lawyers that were representing my brother.  I wasn't supposed to talk to them, period.
>
> [Counsel]:   Well, we're talking about right now, not sometime in the past.
>
> [Steve]:   I'm talking about just here recently, even last night.  I was encouraged not to talk to you—any of you about it.

20 RR 152–53.  In fact, just before Steve Allen testified, counsel warned the trial court that he didn't know how Allen would react to the testimony and thought a heads up to courtroom security might be in order.  20 RR 133.

Further, the mitigation specialist's "service and expense summary" shows no less than seven "attempts" or "calls" to contact Allen's "mother, sisters[14] and brother" and "aunt."   4 Supp. SHTr. 729–730 ("attempts" or "calls" on April 12, 2003; May 14, 2003; May 16, 2003; August 14, 2003; October 3, 2003; February 2, 2004; and February 6, 2004).   And the summary shows at least three attempts to obtain additional contact information when those attempts faltered.   4 Supp. SHTr. 730 ("research" or meeting with Allen "to obtain additional contact information" on January 29, 2004; and twice on February 3, 2004).   Finally, for whatever it is worth, there is a handwritten note that appears to be on the back of the mitigation specialist's business card found in counsel's trial file: "South Texas Project—Dana Lynn Recer's intern[—]stayed on mom's doorstop for 40 hours to get interview."   3 Supp. SHTr. 522.   Allen and his family's lack of cooperation with counsel was not a convenient excuse, it was real, substantial, and well-documented.

The state habeas court credited counsel's explanations regarding the difficulties in developing a mitigation case for Allen.   The court found that Allen "would not divulge any personal information when it came to

---

[14]   The summary shows that the mitigation specialist placed calls to Allen's "sister Vicki" and "Beverly Durst to attempt to set up interviews."   4 Supp. SHTr. 730.   This directly discredits Vickie Allen's and Beverly Durst's affidavits in the state habeas court stating that no one had attempted to contact them to testify.   SHCR 232, 237.   Indeed, Vickie Allen's claim of non-contact is all the more unbelievable given that Steven Allen was interviewed in her home by a member of the defense team.   SHCR 232.

mitigation," that Allen's "family would not communicate with [the mitigation specialist] and would not come forward to help [Allen]," and that Allen's "family, other than Steve, was uncooperative and did not provide counsel with beneficial information regarding [Allen's] past."  Supp. SHCR 250–51 (findings v, ff & vv); *accord* Supp. SHCR 251 (findings gg, hh & jj).  The court also noted that, even three years after Allen's conviction, Allen's mother was not cooperating in an attempt to assist her son.  Supp. SHCR 251 (finding tt).

The state habeas court also found that the mitigation specialist was highly recommended, that he was responsible for investigating mitigating evidence, and that he provided updates to counsel regarding his efforts. Supp. SHCR 250 (findings x, y, z & aa).  The court additionally found that the mitigation specialist billed for 111 hours but spent "a couple of hundred hours over the approved money" on the case.  Supp. SHCR 250 (findings bb & cc).  The court found that counsel's actions in seeking out and relying upon a mitigation specialist were reasonable.  Supp. SHCR 252 (finding xx).

Ultimately, the state habeas court concluded that Allen had failed "to show that counsel conducted an inadequate investigation into [Allen's] background," and that Allen had "failed to provide any evidence that counsel could have used that would have altered the outcome of this trial."  Supp. SHCR 252 (conclusions a & b).  These findings and conclusions, adopted by

the Court of Criminal Appeals, are undeniably reasonable in light of then-existing Supreme Court precedent.[15]

"The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Strickland*, 466 U.S. at 691. In this vein, "when a defendant blocks his attorney's efforts to defend him . . . he cannot later claim ineffective assistance of counsel." *Roberts v. Dretke*, 356 F.3d 632, 638 (5th Cir. 2004). Similarly, "[i]nvestigations into mitigating circumstances may be reasonably limited where the defendant fails to call witnesses to his lawyer's attention." *Wiley v. Puckett*, 696 F.2d 86, 99 (5th Cir. 1992). A defendant's refusal to cooperate, however, "does not obviate the need for defense counsel to conduct *some* sort of mitigation investigation." *Porter v. McCollum*, 130 S Ct. 447, 453 (2009).

---

[15] Allen suggests that a "full and fair hearing" is necessary for AEDPA deference, and that the live evidentiary hearing in the state habeas court fell short of this requirement. Amend. Pet. 31–32, 39. Allen is both wrong on the law and the facts of this case. A full and fair hearing is not a prerequisite to the application of AEDPA's deferential standard of review. *Valdez*, 274 F.3d at 948. And even if it was required Allen was nevertheless provided with a live evidentiary hearing before the same judge who presided over his capital trial, he was represented by counsel who was able to cross-examine Allen's prior counsel, and he was allowed to introduce all the evidence he proffered. Such a hearing is the epitome of full and fair.

The state court's finding that counsel was not deficient is objectively reasonable. Clearly established federal law is consistent on the point that, when a defendant hampers his attorney's investigation, the blame is not laid at counsel's feet. *See Cummings v. Sec'y for Dept. of Corr.*, 588 F.3d 1331, 1361 (11th Cir. 2009) (counsel was not ineffective where counsel explained the need for mitigation evidence but the defendant "refused to provide [counsel] with mitigation-related information"); *Fautenberry v. Mitchell*, 515 F.3d 614, 625 (6th Cir. 2008) ("Counsels' inability to discover or establish [mitigating evidence] is directly attributable to [the defendant's] refusal to cooperate, rather than any insufficiency in the investigation."); *Gardner v. Ozmint*, 511 F.3d 420, 427 (4th Cir. 2007) (where defendant refused to cooperate, and instructed his family not to cooperate, counsel's investigation was not deficient); *Lorraine v. Coyle*, 291 F.3d 416, 435 (6th Cir. 2002) ("Trial counsel cannot be faulted for their client's lack of cooperation."). Accordingly, it was not unreasonable for the state habeas court to attribute some of the difficulty in obtaining mitigating evidence to Allen.

Furthermore, this was not simply a case of a recalcitrant defendant, but an entire family who rebuffed counsel's repeated requests to talk about Allen's past. But "[c]ompetence does not require an attorney to browbeat a reluctant witness into testifying, especially when the facts suggest that no amount of persuasion would have succeeded." *Mirzayance*, 556 U.S. at 125;

*accord Carty v. Thaler*, 583 F.3d 244, 263–64 (5th Cir. 2009) (counsel was not ineffective based, in part, on the defendant's family's uncooperativeness); *Smith v. Workman*, 550 F.3d 1258, 1272 (10th Cir. 2008) ("[C]ounsel is not ineffective for failure to discover mitigating evidence where his investigation is stymied by a witness's refusal to be forthcoming."); *Rudd v. Johnson*, 256 F.3d 317, 321–22 (5th Cir. 2001) (counsel not ineffective where witnesses did not fully disclose petitioner's background).  Counsel cannot be considered deficient where potential witnesses refused to cooperate with counsel.

And even though counsel were stymied by Allen and his family they did not stop investigating.  The mitigation specialist obtained Allen's school, military, hospital, employment and Social Security records, and was able to piece together a timeline of Allen's life.[16]  4 Supp. SHTr. 742–43; *accord*

---

[16] Allen seems to take issue with counsel's reliance on a mitigation specialist. Amend. Pet. 49–50.  The guidelines that Allen so heavily relies upon note that mitigation specialists "possess clinical and information-gathering skills and training that most lawyers simply do not have."  American Bar Association, Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Revised Edition, 31 Hofstra L. Rev. 913, 959 (2003) (guideline 4.1, commentary). Indeed, the mitigation specialist:

> compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; *analyzes the significance of the information* in terms of impact on development, including the effect on personality and behavior; *finds mitigating themes* in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation.

Supp. SHCR 252 (finding xx).   Further, despite not being required to "browbeat" Allen's family it appears that counsel did just that, and eventually got Allen's brother Steve to testify.   1 Supp. SHTr. 93; Supp. SHCR 252 (finding yy).   Given the difficulties faced by counsel they were not deficient in their mitigation investigation, and the state court was not objectively unreasonable in so finding.

Assuming deficiency, however, Allen has still not proven prejudice. Allen does not extensively address the evidence which should have supposedly been provided to the sentencing jury although he mentions that "there were historical records of the rape, abuse and neglect that [Allen] had suffered as a child," Amend. Pet. 46, and that several family members and friends provided affidavits to the state habeas court, Amend. Pet. 55.   To the extent that Allen has preserved the prejudice argument despite its conclusory nature the state court was undoubtedly reasonable in finding no prejudice.

As mentioned above several family members and friends of Allen submitted affidavits to the state habeas court.   Charles Wattles, a family

---

*Id* (emphasis added).  The guidelines also note that lead counsel may delegate tasks to members of the defense team, including mitigation specialists.  *Id*. at 999–1004 (guideline 10.4, commentary).  Accordingly, the guidelines expect that counsel will not have the same expertise as a mitigation specialist, that a mitigation specialist will play a role in making decisions regarding "the significance of the information" discovered in an investigation, and that lead counsel will and should delegate responsibilities to mitigation specialists.  That counsel behaved in accord with the guidelines should give this Court no moment to pause.

friend of Allen, stated that: (1) Allen wrote him a letter thanking him for his friendship; (2) Allen's home "was a dump," and dirty; (3) Allen's father was not around often; (4) Allen's family was poor, and they had little food; (4) Wattles took Allen and his siblings on various trips; (5) Allen's brother Glen was mentally ill; (6) Allen's brother Roy was killed; (7) Allen's mother had "mental challenges;" (8) Allen was a good athlete; and (9) Allen's mother "was a disciplinarian." SHCR 214–17.

Several of Allen's sisters submitted affidavits as well, including Shirron Allen, Delisa Nell Allen, Vickie Cheryl Allen, and a half-sister, Beverly Ondra Durst. SHCR 219–37. Generally, these individuals stated that: (1) Allen liked to play with his siblings; (2) Allen "was always in trouble with my mom when he was little;" (3) Allen enjoyed sports; (4) Allen was a "jokester;" (5) Allen had headaches when he was young; (6) Allen's family was poor and had little to eat; (7) Allen stuck up for his sisters; (8) Allen's father was not around much and did not provide for the family; (9) Allen's father physically abused Allen's mother; (10) Allen intervened when Allen's father attacked Allen's mother; (11) Allen's mother gave "spankings all the time;" (9) "cousin Butch" is mentally ill; (12) "uncle Joe was schizophrenic;" (13) Allen's brother Glen "had a mental condition;" (14) Allen sent the family clothing and blankets from the Army; (15) Allen would take them to Astroworld when he was on leave from the Army; (16) Allen got hurt in the Army; (17) Allen was

"quieter when he came out of the Army;" (18) Allen's brother Roy was killed, and Allen was impacted by the death; (19) aunt Sukie was killed by her boyfriend; (20) Allen drank and used drugs; (21) Allen beat his girlfriend; and (22) Allen loves his kids.  SHCR 219–37.

The grandmother of Allen's youngest child stated that: (1) Allen was a good father; (2) Allen provided child support; (3) Allen was frustrated that he couldn't provide more; and (4) Allen bought gifts for his son.  SHCR 239–40. And finally, an ex-girlfriend of Allen averred that: (1) Allen got good grades in high school; (2) Allen acted older than other high school-aged boys; (3) Allen sent flowers and poems; (4) Allen was "health-conscious" and abstained from alcohol and drugs; and (5) she never saw Allen act violent.  SHCR 242–43.

Allen also provided the state habeas court with various documents including: (1) an "affidavit of inability to pay costs" attached to a divorce petition for Allen's mother, 1 Supp. SHTr. 182–86; (2) mental health records for Allen's half-sister Beverly Durst, 1 Supp. SHTr. 187–222; (3) court records showing that Allen's uncle Joe was twice found not guilty by reason of insanity, 1 Supp. SHTr. 223–56; (4) that Allen's cousin who raped him, Edward Mason, had been accused of raping someone else although the charges were dismissed, 1 Supp. SHTr. 257–62; (5) court records regarding the killing of aunt Sukie, 1 Supp. SHTr. 263–68; (6) a divorce petition filed by

Allen against her first husband alleging "acts of cruelty,"[17] 1 Supp. SHTr. 269–75; and (7) an affidavit from Danalynn Recer[18] regarding her assessment of counsel's effectiveness, 4 Supp. SHTr. 646–717.

As described earlier, Allen's brother, Steve Allen, testified during the punishment stage of trial. To summarize Steve Allen testified that: (1) Allen grew up in a large family; (2) the family was extremely poor; (3) the family home had no glass in the windows, bad plumbing, and frequently lacked electricity; (4) all eight children slept on pallets in a one-room, small home; (5) the family did not often have food; (6) the children would frequently be robbed of money and food when they had any; (7) Allen would fight off would-

---

[17] Despite stating that "there were historical records of the rape, abuse and neglect that petitioner had suffered as a child," Amend. Pet. 46, these records document no such thing. They show family members who may or may not be ill— legal insanity is not a medical diagnosis—poverty, death of a family member, and an accusation of rape where the victim was not Allen. These records do not demonstrate that Allen was raped, abused or neglected.

[18] Recer's affidavit reads like one from an impermissible "*Strickland* expert." *See Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998) ("[T]he reasonableness of a strategic choice is a question of law to be decided by the court, not a matter subject to factual inquiry and evidentiary proof. Accordingly, it would not matter if a petitioner could assemble affidavits from a dozen attorneys swearing that the strategy used at his trial was unreasonable. The question is not one to be decided by plebiscite, by affidavits, by deposition, or by live testimony. It is a question of law to be decided by the state courts, by the district court, and by this Court, each in its own turn."). In any event it simply refers to the affidavits and documents described above. 4 Supp. SHTr. 679–80, 683–84. Further, Allen attaches to his federal petition an article from *The New Yorker* regarding Recer that was not considered by the state court. Amend. Pet. Ex. 6, ECF 25-1. Because the state court did not consider it this Court may not either. *See Pinholster*, 131 S. Ct. at 1399 ("It would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonable applied federal law to facts not before the state court.").

be robbers; (8) Allen's father was rarely around; (9) Allen's father beat Allen's mother and the children; (10) Allen's mother beat her children; (11) Allen's older cousins would frequently beat Allen and his siblings; (12) Allen was raped by his cousin, Edward Mason; (13) Allen worked at an early age; (14) Allen provided food for his family; (15) Allen enlisted in the Army; (16) Allen's family loved him; and (17) Allen was good to his family.  20 RR 134–51.

Very little information provided to the state habeas court was not provided to the sentencing jury.  At best, the sentencing jury did not hear that Allen's brother, uncle, and cousin had mental illnesses, that Allen's brother and aunt were killed, and that Allen was good to his children.  Everything else stated by Allen's family and friends was cumulative of that presented at trial and, as such, does not prove prejudice.  *See, e.g., Pinholster*, 131 S. Ct. at 1409–10 ("There is no reasonable probability that the additional evidence . . . would have changed the jury's verdict.  The 'new' evidence largely duplicated the mitigation evidence at trial."); *Woodfox v. Cain*, 609 F.3d 774, 816–17 (5th Cir. 2010) (evidence tantamount to that presented at trial does not establish prejudice).

And even the non-duplicative evidence would have mattered little.  The fact that Allen was impacted by the death of his brother and aunt is not particularly powerful.  *See Soria v. Johnson*, 207 F.3d 232, 251 (5th Cir.

70

2000) ("Soria has not persuaded us that, but for counsel's failure to present evidence of the sudden death of his best friend and his resulting depression and isolation, there is a reasonable probability that the result of the proceeding would have been different."). And although several individuals in Allen's family may have suffered from the effects of mental illness there is still no evidence that Allen actually suffered from some ailment. *See Turner v. Epps*, 412 F. App'x 696, 705 (5th Cir. 2011) ("We cannot see how testimony that a relative also had a mental illness . . . would have a reasonable probability of changing the outcome absent expert testimony linking such evidence to some deeper mental issue."). The mere possibility that Allen has a mental illness is not mitigating and, if he did, such evidence is double edged and may have actually hurt Allen's case. This does not prove prejudice. *See, e.g., Dowthitt v. Johnson*, 230 F.3d 733, 745 (5th Cir. 2000) ("[T]rial counsel's actions in not discovering and presenting the records to the jury to bring out indications of mental illness do not create a 'probability sufficient to undermine confidence in the outcome.'" (quoting *Strickland*, 466 U.S. at 694)); *cf. Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (mental health issues can support a future dangerousness case more than provide a case of mitigation).

Further, the information in the affidavits is not uniformly helpful. Indeed, the jury would have known that Allen was always in trouble as a

child, that Allen drank and used drugs, that Allen could not always support his children, and that Allen beat his girlfriend. This evidence, too, could have hindered Allen's case. *See Hopkins v. Cockrell*, 325 F.3d 579, 586 (5th Cir. 2003) (alcohol and drug abuse is double edged evidence).

But, ultimately, even if all of the evidence Allen faults counsel for not discovering would have been presented the result of trial would have been the same. Allen brutally stabbed Hill and Johnson to death in such a frenzy that the victims' blood spattered on the ceiling, he beat his then-wife Darlene so badly that she would have died without medical treatment, he threw a then-fourteen-year-old child from a second story window, and killed a man over a $10.00 debt and a chain. Allen had also beaten another ex-girlfriend, fought in jail while awaiting trial, and expressed no remorse for the killing of Hill and Johnson. Adding to this mix the mostly cumulative, sometimes damaging, testimony of friends and family would not have changed Allen's sentence, and it was not objectively unreasonable for the state court to so find. This claim should therefore be denied with prejudice.

## V.   Allen's Claim That His State Habeas Counsel Was Ineffective Is Without Merit.

It is unclear whether Allen raises a free-standing ineffective-assistance-of-state-habeas-counsel claim, or is merely reiterating his argument that such ineffectiveness should excuse the procedure defaults

incurred in this case.  *Compare* Amend. Pet. 7–9, *with* Amend. Pet. 58–63. The claim fails either way.

To the extent that Allen claims he has a constitutional right to counsel during his state habeas proceeding, he errs.  *See Murray v. Giarratano*, 492 U.S. 1, 10 (1989) (neither the Due Process Clause nor the Eighth Amendment require that death-sentenced inmates be afforded counsel during state habeas proceedings); *Pennsylvania v. Finley*, 481 U.S. 551, 556–57 (1987) (due process does not require the appointment of counsel to inmates during state habeas proceedings).  Accordingly, because federal habeas relief only lies for constitutional and federal law violations, Allen cannot prevail.[19]  *See Nichols v. Scott*, 69 F.3d 1255, 1275 (5th Cir. 1995) ("An attack on a state habeas proceeding does not entitle the petitioner to habeas relief in respect to his conviction, as it 'is an attack on a proceeding collateral to the detention and not the detention itself.'" (quoting *Millard v. Lynaugh*, 810 F.2d 1403, 1410 (5th Cir. 1987)).  Similarly, and as mentioned earlier, Allen cannot overcome the procedural defaults present in this case.  *See supra* Section I(A). Allen's claim should, consequently, be denied with prejudice.

---

[19]  Allen suggests that Texas's attorney appointment statute demonstrates the intention of "both the Texas legislature and the Texas Court of Criminal Appeals" to provide constitutionally effective assistance of counsel.  Amend. Pet. 59. This interpretation of Texas's attorney appointment statute has been rejected by the Court of Criminal Appeals.  *Ex parte Graves*, 70 S.W.3d 103, 113–18 (Tex. Crim. 2002).  Even if it did this would be a state-created right and federal habeas relief would be unavailable.

## VI.   A Stay and Placement of this Case in Abeyance Is Unwarranted.

Allen mentions that, in some circumstances, a federal habeas court may stay a case and place it in abeyance so that a petitioner may exhaust claims in the state forum.  Amend. Pet. 60.  It does not appear that Allen actually requests such action of this Court.  *See id*. ("A more appropriate remedy [than stay and abate] is for the federal court . . . to substantively consider the claims presented.").  To the extent that Allen does request such relief, it is unwarranted.

A "stay and abeyance should be available only in limited circumstances." *Rhines v. Weber*, 544 U.S. 269, 277 (2005).  Those "limited circumstances" exist only when a petitioner has (1) shown good cause for the failure to exhaust; (2) the claim is not plainly meritless; and (3) there is nothing to indicate that the failure to exhaust was made for purposes of delay.  *Id*. at 277–78.  A court should review such requests with caution because a stay and abeyance has the potential to "frustrate AEDPA's goal of finality by dragging out indefinitely . . . federal habeas review." *Id*. at 277.

To the extent that Allen alleges the ineffectiveness of state habeas counsel as good cause for the failure to exhaust his claims, such argument fails.  *See Williams v. Thaler*, 602 F.3d 291, 309 (5th Cir. 2010) ("Williams offers his alleged actual innocence and the conflict under which his state habeas counsel labored as good cause for his failure to exhaust . . . but as

74

discussed above, neither suffices."). Moreover, as discussed above, three of Allen's four ineffective assistance claims are procedurally defaulted because they are unexhausted and would be barred from further state court review under Texas's abuse-of-the-writ statute. *See supra* Sections I(A), II(A), III(A). This renders the claims plainly meritless for purposes of a stay and abeyance. *See Neville v. Dretke*, 423 F.3d 474, 480 (5th Cir. 2005) ("Neville's unexhausted claims are 'plainly meritless' because he is now procedurally barred from raising those claims in state court."). A stay and abeyance would therefore be inappropriate in this case and should be denied to the extent that it is requested.[20]

---

[20]   If Allen is requesting a stay based on now-pending cases before the Supreme Court, Amend. Pet. 63 n.16, that request, too, should be denied. In part, Allen relies on the stay granted to John Lezell Balentine. *See Balentine v. Texas*, 131 S. Ct. 3017 (2011). But "[o]rders granting stays are not precedential decisions." *Schwab v. Sec'y, Dept. of Corr.*, 507 F.3d 1297, 1301 (11th Cir. 2007). The second case Allen relies on is *Martinez v. Ryan*, 131 S. Ct. 2690 (2011), where the Supreme Court granted a writ of certiorari to address the following question:

> Whether a defendant in a state criminal case who is prohibited by state law from raising on direct appeal any claim of ineffective assistance of trial counsel, but who has a state-law right to raise such a claim in a first post-conviction proceeding, has a federal constitutional right to effective assistance of first post-conviction counsel specifically with respect to his ineffective-assistance-of-trial-counsel claim.

Question Presented, Supreme Court of the United States, http://www.supremecourt.gov/qp/10-01001qp.pdf (last visited Jan. 31, 2012). Texas law does not impose such a restraint on ineffective-assistance-of-counsel claims, however. *See, e.g., Lopez v. State*, 343 S.W.3d 137, 142–44 (Tex. Crim. App. 2011) (explaining that claims of ineffective assistance may be considered on direct appeal). Thus, *Martinez* is distinguishable. Moreover, it is doubtful that the Supreme Court will find a constitutional right to postconviction counsel given their recent declination to do so. *Maples v. Thomas*, No. 10-63, 2012 WL 125438, at *10 (U.S.

**CONCLUSION**

Because Allen's claims have no merit the Director respectfully requests that Allen's petition for writ of habeas corpus be denied with prejudice, that no certificate of appealability issue, and that a stay be denied to the extent that Allen requests such relief.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DON CLEMMER
Deputy Attorney General
For Criminal Justice

EDWARD L. MARSHALL
Chief, Postconviction Litigation Division

 /s/ Matthew Ottoway
*MATTHEW OTTOWAY
Assistant Attorney General
State Bar No. 24047707

*Counsel of Record

Post Office Box 12548, Capitol Station
Austin, Texas 78711
Tel: (512) 936-1400
Fax: (512) 320-8132

ATTORNEYS FOR RESPONDENT

---

Jan. 18 2012) ("Negligence on the part of a prisoner's postconviction attorney does not qualify as 'cause' . . . [w]e do not disturb that general rule.").  A stay should therefore not be granted to the extent that Allen seeks one based on *Balentine* and *Martinez*.

## CERTIFICATE OF SERVICE

I do herby certify that on January 31, 2012, I electronically filed the forgoing pleading with the Clerk of the Court for the U.S. District Court, Western District of Texas, using the electronic case-filing system of the Court. The electronic case-filing system sent a "Notice of Electronic Filing" to the following counsel of record, who consented in writing to accept the Notice as service of this document by electronic means:

Robert M. Rosenberg
ATTORNEY AT LAW
3303 Main Street, Suite 305
Houston, Texas 77002

/s/ Matthew Ottoway
MATTHEW OTTOWAY
Assistant Attorney General

77